UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JESSICA K. DIAMOND,
     22318 Delia Court
     Calabasas, CA 91302

       *Plaintiff,*

     v.

DOUGLAS A. COLLINS,
in his official capacity as Secretary,
United States Department of
Veterans Affairs,

       Serve:
       U.S. Department of Veterans Affairs
       Office of General Counsel
       810 Vermont Ave., N.W.
       Washington, D.C. 20420

       Civil Process Clerk
       Office of the U.S. Attorney
        for the District of Columbia
       601 D Street, N.W.
       Washington, D.C. 20530

       *Defendant.*

No. 1:25-cv-4120

Jury Trial Demanded

**COMPLAINT FOR DECLARATORY, INJUNCTIVE
AND MONETARY RELIEF**

*Introduction*

1.     This civil action alleges blatant, severe and protracted disability

discrimination by the U.S. Department of Veterans Affairs against one of its most

dedicated professional employees, Plaintiff Jessica Diamond, a dietitian at the VA Medical Center in Los Angeles, California. Ms. Diamond avers that she was punished for her own exigent medical needs as a cancer survivor, first by a forced reassignment in lieu of the job she was already performing excellently from home, and then by a series of hostile employer actions designed to deprive her of employment or break her spirit or both. These wrongs constituted discrimination, failure to accommodate, retaliation, and hostile work environment / harassment in violation of Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791 ("Rehabilitation Act").

### *Jurisdiction and Venue*

2.     This Court has personal jurisdiction over Defendant because Defendant, and the Agency over which he presides, conduct regular business in the District of Columbia and because the Agency, headquartered in the District of Columbia, maintains regular and systematic contacts with the District of Columbia.

3.     This Court has subject matter jurisdiction over this action pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 791, and under 28 U.S.C. §§ 1331, 1332, and 1343.

4.     Venue in this District is proper pursuant to 29 U.S.C. § 791 and 28 U.S.C. § 1391 because Defendant maintains its principal office in the District of Columbia, and because the employment records relevant to its unlawful practices are maintained here.

5.   Ms. Diamond has exhausted the administrative remedies available to her by filing this action within 90 days after a final agency decision on her EEO complaint under the Rehabilitation Act.

### *Parties*

6.   Plaintiff Jessica Diamond is a resident of California and has worked for Defendant as a clinical dietitian since approximately 2009. She is a registered dietitian under California law. She holds a bachelor's degree in Nutritional SciencesDietetics from the University of Wisconsin at Madison, and a master's degree in public health from the University of California at Los Angeles.

7.   Defendant Douglas A. Collins is the Secretary of Veterans Affairs. As the head of the Department of Veterans Affairs ("VA" or "the Department"), he oversees the provision of health, education, disability, and other benefits for eligible military veterans. The Department is headquartered in the District of Columbia.

### *Factual allegations*

8.   Ms. Diamond began her professional service at the Department of Veterans Affairs in 2009 as an intern at the West Los Angeles VA Medical Center in furtherance of her academic requirements. In 2011, at the conclusion of her studies, the Nutrition and Food Service Department hired her as a Clinical Dietician, GS-11, Step 7, where she worked inpatient in the main hospital. In 2017, she was reassigned to the Community Living Center ("CLC") at the same VA facility.

9.    Ms. Diamond worked full-time as a clinical dietitian from September 2011 through July 2017, and at that time became a part-time clinical dietitian with

3

a schedule of 20 hours or 2.5 days per week, comprising two eight-hour shifts and one four-hour shift, the same schedule as several of her colleagues at the same facility.

10.     In her role as a clinical dietician at the CLC, both full-time and part-time, Ms. Diamond consistently received high performance ratings, including numerous "outstanding" ratings, the highest ratings possible.

11.     In January of 2020, Ms. Diamond was diagnosed with mediastinal diffuse large B-cell (non-Hodgkins) lymphoma, a cancer that invaded the central veins of her chest and permanently obliterated her superior vena cava and both of her brachiocephalic veins. In addition, the cancer occluded her right subclavian vein, her left subclavian vein proximal to the superior vena cava, and her right internal jugular vein. The "permanent destruction" of these veins, in the words of her interventional radiologist, Scott Genshaft, M.D., prevented blood from flowing normally from Ms. Diamond's brain back to her heart, resulting in a backup of blood in the face and arms known as superior vena cava ("SVC") syndrome. Besides edema (swelling) in the face, neck, and arms, symptoms of SVC syndrome include blurred vision, difficulty breathing, and orthostasis, or fainting, particularly with or after any physical exertion. In some cases, the obstruction of the superior vena cava can lead to cerebral edema, or swelling in the brain, which can cause potentially life-threatening brainstem herniation.

12.     Ms. Diamond's case of SVC syndrome is "chronic," "profound," and "lifelong," in the words of Dr. Genshaft. Her chronic symptoms include orthostasis

(fainting or becoming dizzy), shortness of breath, facial swelling, and neurological symptoms in her head and upper extremities that worsen with nearly all types of physical activity. Routine tasks that involve physical exertion, including walking, climbing stairs, and even standing up, can pose significant health consequences for her: a fall from fainting can lead to a traumatic injury because of the blood thinners she must take for the rest of her life, as described below, and any worsening of her chronic facial edema can compromise her airway and make breathing difficult if not impossible.

13.     Thrombotic events, or blood clots, can be life-threatening in persons with SVC syndrome. This is because in such a person, the destruction of the large veins that carry blood from the brain to the heart forces the blood into smaller vessels ("collateral veins") with less blood-carrying capacity and thinner, more fragile walls. A thrombotic event worsens the SVC syndrome patient's venous obstruction by blocking off the smaller vessels that have helped offload the venous pressure. This results in an acute rise of venous pressure of the head, neck, and upper torso. In these patients, even small or temporary clots—which might cause no symptoms in healthy persons—can cause sudden, severe blockages with devastating consequences including cerebral edema, herniation, or hemorrhage, stroke, airway compromise, physical paralysis, loss of brain or bodily functions, hemodynamic instability and death.

14.     Ms. Diamond has already experienced deep vein thromboses, and with her history of those and of SVC syndrome is at higher risk of lethal thrombotic

events in the future. To mitigate these mortal dangers to the extent possible, Ms. Diamond takes blood thinners, and will have to do so for the rest of her life. Blood thinners introduce their own adverse side effects, including hypotension (low blood pressure) that itself can cause fainting, as well as limiting her body's ability to stop the bleeding that might result from a fall or other mishap in a faint.

15. From January 2020 through June 2020, Ms. Diamond took leave to undergo cancer treatment. She exhausted her paid leave in February 2020 and then began a period of leave without pay under the Family and Medical Leave Act ("FMLA"). After exhausting her twelve weeks of FMLA leave, Ms. Diamond remained on leave without pay ("LWOP") status until she returned to remote work in July 2020.

16. Between January and May 2020, Ms. Diamond underwent six cycles of a chemotherapy known as DA-EPOCH-R. Between May and July 2020, she underwent two cycles of methotrexate chemotherapy. During that half-year period she also required repeated emergency medical procedures, known as pericardiocenteses, to remove fluid that was surrounding and compressing her heart. Her aggressive chemotherapy, her SVC syndrome, and her cardiac difficulties, separately and together, severely weakened her immune system and made her medically unable to receive her first of two intended doses of the COVID-19 vaccine until late 2021.

17. Ms. Diamond suffered an anaphylactic reaction to her first two doses of the COVID-19 vaccine, and therefore was—and to this day remains—medically

6

unable to receive any further COVID-19 vaccinations or boosters because her true allergic reaction to the vaccine could make any subsequent dose life-threatening.

18.    For a person with Ms. Diamond's medical condition, any serious lung infection can quickly have cardiorespiratory complications and become life-threatening or life-ending.

19.    Because she cannot be immunized against COVID-19, Ms. Diamond is unprotected from the virus and at higher risk of contracting it, and if infected is at higher risk of severe complications.

20.    One of the best-known and most severe possible complications of COVID-19 is blood clotting, the very symptom which, as described above, could cause stroke, paralysis, or death in any person, but is more likely to injure or kill Ms. Diamond than almost any other individual because of her SVC syndrome.

21.    In other words, Ms. Diamond is in an immunocompromised state, is at higher risk of contracting COVID-19, and if infected is susceptible to the worst possible COVID-19 outcomes. These increased risks give her the most compelling of reasons to follow her physicians' instructions to avoid exposure to the virus.

22.    On discovering these exigent medical facts, and based on her physicians' instructions, Ms. Diamond immediately adopted an array of stringent routines of daily living and has kept to them rigorously ever since.

23.    She avoids entering any indoor spaces except for her home and medical visits (and when those cannot be avoided, she wears an N95 mask and minimizes her time indoors); she does not go inside the homes of other family members or

7

anyone else; she does not shop except in the rarest circumstances, but has food and household necessities delivered to her doorstep; she does not attend religious services in person; she wears an N95 mask in outdoor crowded spaces when it is not possible to achieve social distancing; and she avoids proximity to other persons except when medically necessary, and during medical visits requires anyone interacting with her to wear an N95 mask at all times when they are nearby or in the same interior space with her.

24.    The family members Ms. Diamond lives with, specifically her mother, father, sister, and son, observe the same restrictions that she does: they do not enter any indoor spaces except for their shared home and medical visits unless absolutely necessary, and when they do, they take the same precautions as she does, including N95 mask wearing; they do not go shopping in person but obtain their necessities by home delivery; they avoid proximity to other persons; they group medical visits together to minimize separate incidents of exposure, and quarantine away from her after receiving their own medical care or when they have been exposed to other persons; and they wear N95 masks as rigorously as she does.

25.    For necessary medical appointments, Ms. Diamond and her treating clinicians observe the following precautions: they schedule her appointments as the first of the day, when the office is at its emptiest; she waits outdoors until the examination room is ready rather than waiting in waiting rooms; she goes directly into the examination room to avoid other people; she wears an N95 mask herself, and anyone who interacts with her must do likewise; she makes her appointments

8

as brief as possible; she leaves the facility immediately after any such appointment and goes back outdoors; and otherwise minimizes exposure to the maximum extent possible.

26.   By the time Ms. Diamond returned to remote work in June 2020, the COVID-19 workplace shutdown was in effect, and all other dietitians in her unit were working remotely for two of their three days of part-time work each week.

27.   Because of Ms. Diamond's medical condition, her first-line supervisor, Inpatient Section Chief Shari A. Kushins, and Ms. Kushins' supervisor, Deputy Chief of Nutrition and Food Services Jennifer Karp, gave Ms. Diamond explicit permission to work remotely for all three days of her work week. Ms. Diamond continued to work 100% remotely without issue for approximately two years, during which she received exceptional performance appraisals as described herein.

28.   On April 19, 2022, Ms. Diamond's third-level supervisor, Chief of Nutrition and Food Services Diane Freyling, suspended the option for dietitians to work remotely and required them to return to work in person beginning May 5, 2022.

29.   However, on April 20, 2022, Ms. Freyling informed Ms. Diamond that the return-to-work mandate would not apply to Ms. Diamond due to her medical condition, and that she could continue to work all her hours remotely.

30.   Because Ms. Freyling was nearing retirement, she advised Ms. Diamond in April 2022 to request a reasonable accommodation formally, to ensure there would not be any issues after Ms. Freyling left. Ms. Freyling reassured

9

Ms. Diamond that the reasonable accommodation process existed precisely to address the circumstances in which Ms. Diamond found herself. Ms. Freyling praised Ms. Diamond as an exceptional employee for the entire period of her service, including the time she worked 100% remotely. Ms. Freyling indicated that she had no problem with Ms. Diamond's continuing to work exclusively remotely. Ms. Freyling stated that she was confident Ms. Diamond's request would be approved.

31.    However, toward the end of April 2022, after meeting with Ms. Karp and then-Assistant Chief of Nutrition and Food Services Terri Verone, Ms. Freyling expressed diminished confidence that Ms. Diamond's accommodation request would be honored. Ms. Freyling explained that Ms. Karp and Ms. Verone "brought up a good point" that "what we do for one person, we have to do for other people." In making this assertion Ms. Freyling did not attempt to distinguish, and did not report that either Ms. Karp or Ms. Verone had made any attempt to distinguish, between individuals with disabilities and those without.

32.    Nevertheless, on May 3, 2022, following Ms. Freyling's advice, Ms. Diamond submitted her first request for a reasonable accommodation to work fully remotely ad she could not "appear in person." She accompanied this request with supporting medical documentation from her treating physician.

33.    On May 31, 2022, Ms. Freyling, human resources officer Mario Lanzilotta (the Los Angeles VA's "local reasonable accommodation coordinator") and Ms. Diamond met to have an interactive discussion about Ms. Diamond's pending

10

accommodation request. Ms. Freyling stated, "No one likes returning to work after working from home," and asked, "What's going to happen if everyone starts requesting this?" Ms. Diamond reiterated that her remote-work accommodation request was based on a compelling medical need to work remotely.

34. On June 1, 2022, prior to a final determination on Ms. Diamond's accommodation request, Ms. Freyling retired, and Ms. Karp took over as the official with authority to decide that request. Prior to her departure, Ms. Freyling signed an interim accommodation dated June 1, 2022, allowing Ms. Diamond to continue working remotely, as she had been doing, pending the decision on her request for the same accommodation going forward.

35. On June 22, 2022, Ms. Karp held a second meeting with Ms. Diamond and Mr. Lanzilotta, purportedly to engage in an interactive dialogue, even though Ms. Diamond had just been through the same process with Ms. Freyling a few weeks earlier.

36. During this meeting, Ms. Karp focused on the supposed unfairness of allowing Ms. Diamond to work remotely while other dietitians were required to work in person. Notwithstanding Mr. Lanzilotta's explanation that the law requires providing accommodations for individuals who have medical conditions like Ms. Diamond's, Ms. Karp insisted that allowing Ms. Diamond to work from home was a "slippery slope" toward allowing all other dietitians to work from home.

37. On August 19, 2022, Ms. Karp formally denied Ms. Diamond's

11

accommodation request to work from home. Instead, Ms. Karp proposed a "detail" that would exempt Ms. Diamond from the requirement to work in the office in person but allow her to remain working in the CLC remotely. The position's description and functions were identical to what Ms. Diamond had previously been doing. Ms. Karp limited this "detail" to 9 months, to expire in May 2023.

38. In March 2023, as this "detail" was nearing its expiration date, Ms. Diamond contacted the human resources office at the Greater Los Angeles VA Medical Center for guidance. HR recommended that Ms. Diamond ask her superiors to extend the current "detail" informally as an accommodation to allow her to continue working as she had been for the preceding three years. HR further expressed the belief that it was reasonable for Ms. Diamond's department to approve an informal agreement so that a new accommodation request would not be necessary.

39. On March 3, 2023, Ms. Diamond e-mailed Ms. Karp; Marissa Podell, who at the time was her direct supervisor; and Ms. Verone, who by that time had taken over as Chief of Nutrition and Food Services, making that request and requesting a meeting to discuss it.

40. On March 6, 2023, Ms. Verone denied that request, informing Ms. Diamond that she would be expected to return to "on-site patient care on 3/9/23 and no at this time there is no need for a meeting." Ms. Verone went on to say that if Ms. Diamond could not return to on-site work, she would need to take leave, and either apply for FMLA leave or submit a new reasonable accommodation request.

12

41.	On March 8, 2023, following Mr. Lanzilotta's advice, Ms. Diamond submitted her second request for a reasonable accommodation, asking to continue to work remotely as she could not "appear in person." She accompanied this request with supporting documentation from her treating physician.

42.	On March 9, 2023, while her March 8th request was pending, Ms. Diamond contacted Ms. Verone to discuss an interim accommodation like the one granted by Ms. Freyling, allowing her to continue working at the CLC remotely--as she had been doing successfully since 2020—while her new accommodation request was pending.

43.	On this call, Ms. Verone told Ms. Diamond that she would not approve any new reasonable accommodation request, stating, "I like to be honest, and any reasonable accommodation you submit, I will be rejecting," and further stating that that she would not approve any interim accommodation allowing Ms. Diamond to continue working instead of taking leave while her request was being processed. Ms. Verone asserted that Ms. Diamond's working remotely at the CLC was a "patient safety risk" based on her "opinion and feeling." Ms. Verone did not identify any specific "safety concern," or any basis for such a "concern," and made no mention of Ms. Diamond's own safety concerns or medical needs.

44.	After this call, Ms. Diamond contacted Mr. Lanzilotta, who recommended an interactive discussion with Ms. Verone and Ms. Diamond regarding an interim accommodation.

45.    On March 15, 2023, Ms. Diamond met with Mr. Lanzilotta and Ms. Verone, who by that time had taken over as Chief of Nutrition and Food Services, to discuss an interim accommodation to allow her to continue working remotely until she received a final decision on the pending request.

46.    During this meeting, Ms. Verone again sated that she would not approve any accommodation request, because she believed that for Ms. Diamond to work remotely would create a "safety concern." Ms. Verone again failed to identify any such "concern" specifically, or state any basis for such a "concern," and once again made no mention of Ms. Diamond's own safety concerns or medical needs.

47.    After the meeting, Ms. Verone formally denied Ms. Diamond's interim accommodation request, and informed Ms. Diamond that she could either resign or take leave, including leave without pay ("LWOP"), while she waited for a determination on her accommodation request. Because the Agency refused to grant an interim accommodation allowing her to continue working from home, Ms. Diamond was forced to exhaust all of her sick and annual leave while she awaited a decision on her accommodation request.

48.    Upon exhausting her leave, on or about May 31, 2023, Ms. Diamond was forced into LWOP status.

49.    On May 19, 2023, Diamond met with Ms. Verone and Rocky Gutierrez, another "local reasonable accommodation coordinator" in the facility's human resources office, supposedly for an interactive discussion about Ms. Diamond's still-pending second accommodation request.

50.    Ms. Verone was present but did not participate in this meeting in any meaningful way. She greeted Ms. Diamond at the start of the meeting but did not speak at all for the remainder of the meeting. Ms. Verone's refusal to engage in the interactive process indicated to Ms. Diamond that Ms. Verone had already decided to deny Ms. Diamond's accommodation.

51.    On May 26, 2023, Ms. Verone denied Ms. Diamond's second request for accommodation, again asserting that it would be a "safety concern" if Ms. Diamond worked remotely. Instead of providing Ms. Diamond with an accommodation that would allow her to continue performing her existing job, Ms. Verone assigned Ms. Diamond to a different nine-month "detail," in effect a job transfer, to an outpatient program known as Weight Management Program for Veterans ("MOVE") that would allow her to work entirely from home.

52.    This transfer was highly undesirable, as the work was widely considered duller and less professionally rewarding than other dietitian roles regardless of salary, and Ms. Diamond's superiors knew their dietitians universally disfavored the MOVE program as a work placement.

53.    This transfer was an intentional effort to disparage and harm Ms. Diamond professionally, either as retaliation for her prior protected activity or as a cynical inducement to her to drop her accommodation request, or both.

54.    At a training for dietitian interns in 2022, Ms. Karp and Ms. Verone had explicitly told the intern group that when one of their employees requests an accommodation they deem "unfair," or motivated by an insincere desire to avoid the

same work that other workers must do, they "recommend a job reassignment that they don't like. And once they are offered a role that isn't desirable, . . . you know what happens? Their disabilities miraculously resolve."

55.     On June 7, 2023, Ms. Diamond submitted a request for reconsideration of the denial of her accommodation. From June 7 through July 11, 2023, Ms. Diamond repeatedly asked HR to schedule a time for an interactive meeting on the subject, giving her a day's notice to arrange child care, but no such meeting was ever held.

56.      On July 11, 2023, Jennifer Worley, associate director of operations for the Los Angeles VA facility's Food and Nutrition Services division and the management official in charge of deciding Ms. Diamond's pending accommodation request, issued via e-mail a determination denying that request, and stated that she did not need an interactive meeting, but had enough information without it to make the decision to "detail" Ms. Diamond to the MOVE program.

57.     Ms. Diamond then spoke to "reasonable accommodation specialist" Rocky Gutierrez of her HR office about her concern that this decision had been made without an interactive discussion, and an interactive discussion was scheduled for July 24, 2023, with Ms. Worley, Mr. Gutierrez and Ms. Diamond.

58.     On July 21, 2023, Mr. Gutierrez notified Ms. Diamond that, even without an interactive dialogue of any kind, and even though an interactive discussion had been scheduled for the following week, she was required to decide by that very day whether to accept the "detail" to the MOVE program, and that if she

16

did not accept it she would be marked from then on as absent without leave ("AWOL").

59.     On July 24, 2023, Ms. Diamond had a meeting with Ms. Worley, Mr. Gutierrez, and Denise Watts, a union representative. During this meeting Ms. Worley acknowledged that Ms. Diamond was fully capable of performing all the functions of her dietitian job at the CLC from home, but claimed the real reason for the reassignment was that the MOVE program was in dire need of dietitians.

60.     That claim was false when Ms. Worley made it, and Ms. Worley knew that claim was false when she made it. In fact, Ms. Worley had no such information and had made no attempt to obtain it, as alleged below.

61.     On July 25, 2023, Mr. Gutierrez notified Ms. Diamond that she was now required to decide by August 3, 2023, whether to accept the "detail" to the MOVE program, and that if she did not accept it she would be marked from then on as absent without leave ("AWOL"). Because there had been no interactive process, Ms. Diamond felt compelled to accept the "detail" to MOVE. On August 3, 2023, at 2:50 p.m., she confirmed that acceptance via e-mail to Mr. Gutierrez.

62.     Ms. Diamond began remote work in the MOVE program on the morning of August 4, 2023, by reporting remotely to Nutrition and Food Services Inpatient Section Chief James Wong.

63.     In his first contact with Ms. Diamond that morning, Mr. Wong stated that he had no idea that Ms. Diamond had been assigned to the MOVE program; that he thought Ms. Diamond was contacting him only to help facilitate a patient's

entry into the program, not to begin working there; that the MOVE program was already fully staffed; and that he had little or nothing for her to do.

64.     Neither Ms. Worley nor anyone in Nutrition and Food Services (a) had ever informed Mr. Wong of Ms. Diamond's reassignment to MOVE, or (b) had ever discussed with Mr. Wong whether MOVE needed Ms. Diamond's services or had any work for her.

65.     In her first days working for the MOVE program, Ms. Diamond discovered that certain administrative software used by MOVE known as Veteran Video Connect ("VVC") was not running properly on her computer at home. Mr. Wong offered her the use of a government laptop on which that software would run properly. He later informed her that the VA would not deliver the laptop to her home and that she would be required to visit the hospital to obtain it.

66.     This new requirement directly conflicted with Ms. Diamond's treating physicians' instructions that she not "appear in person" due to medical disability.

67.     On or about August 22, 2023, Mr. Wong explained to Ms. Diamond that a government-issued laptop was not strictly necessary to the performance of her MOVE duties.

68.     On or about August 30, 2023, Mr. Wong informed Ms. Diamond that since the VVC software was not running properly on her home equipment, she should begin conducting patient visits by telephone instead. Through Mr. Wong, Ms. Diamond was oriented to telephone-based patient care by CLC Outpatient Section Chief Kristi Gentile and began conducting telephone visits, primarily with

patients from the outpatient section rather than the MOVE program since the former had higher patient demand.

69.     Meanwhile, on or about August 31, 2023, Mr. Wong gave Ms. Diamond contact information for an information technology help desk specifically for VVC issues. Ms. Diamond contacted that help desk, but its personnel were unable to resolve the problem. Mr. Wong thereupon instructed her to continue visiting with patients via telephone and assured her that this would be satisfactory.

70.     In September 2023, Ms. Diamond's superiors informed her that a change of facility cybersecurity arrangements now required her to obtain a new personal identification card ("PIV") by December 2023, with a new photograph of her (without a COVID mask on), another task they claimed could be done only through an in-person visit.

71.     Ms. Diamond's superiors made an appointment for her to visit the medical center on September 13, 2023, to obtain a government laptop and a new PIV.

72.     The requirement to report in person conflicted directly with the purpose of her transfer to MOVE, a reassignment she had accepted—under threat of termination if she declined—as the only remote work the VA was willing to make available to spare her the risk of potentially lethal exposure to COVID-19 and other respiratory pathogens in the hospital. Ms. Diamond explained to Mr. Wong and Ms. Verone that she was unable to report on site to the hospital due to her condition, which was why she had the 100% remote work accommodation in the

19

first place, and repeated that she had been promised, at the time of her transfer to MOVE, that she would be provided with all necessary training and equipment to perform her MOVE duties under her existing remote-work accommodation.

73.    Ms. Verone stated that she was "fully aware" that Ms. Diamond's accommodation called for 100% remote work, but nevertheless insisted that the existing accommodation did not explicitly state that Ms. Diamond would never be required to report to the facility, and stated that a further request for accommodation would be necessary if Ms. Diamond wished to be exempted from all in-person appearances at the hospital.

74.    Accordingly, on September 12, 2023, after cancelling an appointment made for her for September 13, 2023, without her knowledge or consent, and notifying Mr. Wong and Ms. Verone that she would be cancelling future such appointments based on her inability to report in person and would be submitting a new accommodation request, Ms. Diamond submitted her third accommodation request, citing the same exigent medical needs that had led to the first two requests.

75.    HR denied the request, on the day it was submitted, on the ground that it was "duplicative" of her existing accommodation of 100% remote work and advised her to "work out" the new issue with her supervisors under the existing accommodation. However, HR did not offer, act, or attempt to intercede to that end with Ms. Diamond's supervisors, either then or at any other time, although it knew

20

that Ms. Diamond's superiors were opposed to any such relief under the existing, supposedly granted accommodation.

76.     The next day, September 13, 2023, Ms. Diamond emailed Mr. Wong to complain about management's requirement that she report to the office, and to inform him that she had filed an EEO complaint in the matter.

77.     On September 13, after Ms. Diamond did not report to collect her government computer and PIV card, Ms. Verone instructed Mr. Wong to initiate a *Weingarten* disciplinary investigation of Ms. Diamond.

78.     During his interview of Ms. Diamond for that investigation, Mr. Wong asked her to define the difference between "remote work" and "telework." Ms. Diamond responded that she did not know and asked Mr. Wong what the applicable definitions were. Mr. Wong replied, "I ask the questions. You are not allowed to ask us any questions."

79.     In or about late September 2023, Mr. Wong informed Ms. Diamond that she need not make further efforts to obtain a government laptop computer, and that she could continue visiting with patients over the telephone without use of the VVC software that did not run properly on her home computer. Neither Mr. Wong nor any other agency personnel made further mention of a requirement, or any practicable means, to obtain a government laptop or PIV.

80.     No conclusion or outcome of the September 2023 *Weingarten* investigation of Ms. Diamond was ever announced or communicated to her.

21

81. On September 22, 2023, the parties engaged in mediation pursuant to the informal EEO complaint Ms. Diamond had filed. That mediation did not result in a settlement or resolution of her complaint.

82. On November 9, 2023, Ms. Diamond filed a formal EEO complaint alleging discrimination and retaliation based on her disability and protected civil rights activity.

83. Ms. Diamond continued to visit with her patients via telephone through the end of her MOVE detail in June 2024.

84. In April 2024, Mr. Wong gave Ms. Diamond an evaluation rating of "exceptional," the highest possible, for her MOVE patient care. That evaluation neither mentioned telephone visits nor implied that such visits were in any way less than fully satisfactory patient care.

85. In April 2024, as Ms. Diamond's "detail" to the MOVE program was ending, she submitted a fourth request for a 100% work-from-home accommodation. That request was denied.

86. On June 7, 2024, Ms. Karp sent Ms. Diamond a formal e-mail directing her to report during "walk-in hours" for issuance of her PIV, without any acknowledgment of her long-standing reasonable accommodation or the previous *Weingarten* investigation on the same issue, or consultation with the RA office to address the need for accommodations for an in-person visit, such as scheduling the visit before or after hours to minimize dangerous human contact, plus masking of all nearby personnel and other precautions.

22

87. Days later, Ms. Verone issued Ms. Diamond a "counseling letter" for failure to report by June 30, 2024—a date that had not yet passed—without a word of reply to her requests for clarification about the above accommodations.

88. Neither Ms. Verone nor Ms. Karp responded to follow-up communications, but instead subjected Ms. Diamond to a second *Weingarten* investigation for failing to appear during walk-in hours.

89. At or about the time her MOVE "detail" period ended in June 2024, Ms. Diamond applied for and received the 12 weeks of FMLA leave to which she was entitled for 2024. This leave was without pay.

90. No conclusion or resolution of the second *Weingarten* investigation was ever announced or communicated to Ms. Diamond.

91. On September 13, 2024, Ms. Karp informed Ms. Diamond that her period of FMLA leave would expire on September 20, 2024. Defendant maintained its refusal to allow her any remote work.

92. Unable to report to work in person for the compelling medical reasons described herein, Ms. Diamond continued on LWOP from September 20, 2024, through the conclusion of EEOC administrative proceedings in this case.

93. On October 29, 2024, with her latest accommodation request still pending, Ms. Diamond e-mailed Mr. Lanzilotta about the delay in resolving that request given that she had been scheduled to report to the worksite in person the following day to obtain a PIV badge. She asked that the RA request be determined before she was required to take the serious medical risk of reporting to the worksite

in person, since "if there is no . . . role or position secured for me afterward[,] [t]his would mean taking on a significant and potentially life[-]threatening risk without any clear benefit."

94.     Mr. Lanzilotta was unable to explain the delay in processing Ms. Diamond's pending accommodation request, to give any indication when it would be decided, or to "advise [her] how [she] should proceed" regarding this or future PIV badge appointments that her managers might schedule and order her to keep, with the medical risks that entailed, without knowing whether a job awaited her after so doing.

95.     On December 20, 2024, Ms. Diamond received word that her pending accommodation request had been denied on reconsideration, and that her only alternative to immediate dismissal was a 40-day period of leave to search, on her own, for a job anywhere in the VA before being terminated.

## COUNT I
### Disparate Treatment Based on Disability
### in Violation of the Rehabilitation Act of 1973,
### 29 U.S.C. § 791

96.     Ms. Diamond hereby incorporates each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

97.     As an executive agency of the U.S. government, Defendant at all relevant times has been and continues to be an employer under the Rehabilitation Act.

98.    At all relevant times, Ms. Diamond was a qualified individual with a disability within the meaning of the Rehabilitation Act, suffering from mediastinal B-cell lymphoma and SVC syndrome, conditions that substantially impair her immune and circulatory functions and substantially limit major life activities, including but not limited to performing manual tasks or any physical exertion, walking, standing, lifting, bending, breathing, and working.

99.    In addition, Ms. Diamond at all relevant times has suffered from the independently qualifying disability of allergy to the COVID-19 vaccine, which means she cannot be immunized against COVID-19. This condition substantially impairs the functioning of her immune system and makes her highly susceptible to a severe case of COVID-19, which in her case would be exceptionally life-threatening because of its blood-clotting sequela, a known complication more likely lethal to SVC syndrome sufferers than to almost anyone in the general population. That severe danger makes it imperative that she avoid COVID-19 exposure, and this life-or-death imperative—independently of her disabling cancer and SVC syndrome described herein—substantially impairs her respiratory function and limits her major life activities, including but not limited to breathing and breathing-related activities, caring for herself, being present in public spaces, obtaining necessities, obtaining medical and dental care, attending gatherings, maintaining normal family relations, and interacting in person with others, particularly in close proximity or in closed or poorly ventilated spaces, and overall requires near-total physical isolation, making her virtually a shut-in in her home.

100. At all relevant times, Defendant had actual knowledge of Ms. Diamond's disabilities and functional limitations.

101. At all relevant times, Ms. Diamond was able to perform the essential functions of her job with the reasonable accommodation of working 100% remotely, without undue hardship to Defendant's conduct of its business. Indeed, Ms. Diamond worked 100% remotely without issue for approximately two years, during which numerous supervisors praised her work performance, before a new supervisor revoked the arrangement.

102. Despite Ms. Diamond's excellent performance while working remotely, Defendant denied her reasonable accommodation requests for discriminatory reasons, including supposed concerns about "fairness" to non-disabled employees rather than legitimate operational needs of the Agency, and on false pretexts including inaccurate, incorrect, and/or knowingly false characterizations of their dietitians' job functions.

103. Defendant's decisionmakers, including Ms. Karp and Ms. Verone, , demonstrated disability bias by implementing a policy of denying accommodation requests and imposing undesirable job assignments until employees' "disabilities miraculously resolve."

104. In so doing, Ms. Diamond's supervisors discriminated against her in violation of the Rehabilitation Act by treating her as if her disabilities and resulting functional limitations did not exist, did not have the severity or duration she and

26

her supporting medical documentation described, and/or did not limit her major life activities or preclude in-person work to the degree she claimed.

105.   Defendant punished Ms. Diamond for her disabilities by making it impossible to for her continue the work she had been doing excellently from home, by forcing her repeatedly to exhaust all forms of her paid leave and lapse into LWOP status, by involuntarily reassigning her to a position with undesirable, professionally unrewarding work while not so reassigning others similarly situated, and by turning viciously on her after affecting solicitude for her grievous illness.  In all these respects Defendant treated Ms. Diamond less favorably than non-disabled employees. Defendant's disparate treatment of Ms. Diamond alleged in this Complaint was motivated by discriminatory animus against her on account of her disabilities and constituted unlawful discrimination against her in violation of the Rehabilitation Act.

106.   Ms. Diamond has exhausted her administrative remedies prerequisite to bringing this suit by timely seeking EEO counseling and filing her administrative complaint, and by filing the present Complaint within 90 days of receiving the final agency decision on her EEO complaint.

107.   As a result of Defendant's disparate and discriminatory treatment, Ms. Diamond has suffered and continues to suffer substantial economic and non-economic harms, including but not limited to the loss of wages and benefits from being forced into LWOP status, the loss of medical and annual leave time that would otherwise have remained available to her, and emotional and psychic harms

including soul-crushing disappointment, humiliation, loss of professional identity and self-respect, sense of betrayal, anger, anxiety, depression, insomnia, appetite disturbances, harm to personal relationships, loss of quality of life, and exacerbation of her underlying disabilities, as well as other damages warranting compensation in an amount to be determined at trial.

## COUNT II
### Failure to Provide Reasonable Accommodation
### in Violation of the Rehabilitation Act of 1973,
### 29 U.S.C. § 791

108.   Ms. Diamond hereby incorporates each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

109.   At all relevant times, Ms. Diamond was a qualified individual with a disability within the meaning of the Rehabilitation Act, suffering from mediastinal B-cell lymphoma and SVC syndrome, conditions that substantially impair her immune and circulatory functions and substantially limit major life activities, including but not limited to performing manual tasks or any physical exertion, walking, standing, lifting, bending, breathing, and working.

110.   In addition, Ms. Diamond at all relevant times has suffered from the independently qualifying disability of allergy to the COVID-19 vaccine, which means she cannot be immunized against COVID-19. This condition substantially impairs the functioning of her immune system and makes her highly susceptible to a severe case of COVID-19, which in her case would be exceptionally life-threatening because of its blood-clotting sequela, a known complication more likely lethal to SVC syndrome sufferers than to almost anyone in the general population.

28

That severe danger makes it imperative that she avoid COVID-19 exposure, and this life-or-death imperative—independently of her disabling cancer and SVC syndrome described herein—substantially impairs her respiratory function and limits her major life activities, including but not limited to breathing and breathing-related activities, caring for herself, being present in public spaces, obtaining necessities, obtaining medical and dental care, attending gatherings, maintaining normal family relations, and interacting in person with others, particularly in close proximity or in closed or poorly ventilated spaces, and overall requires near-total physical isolation, making her virtually a shut-in in her home.

111.   Despite her disabilities as described in this Complaint and in the preceding Count, Ms. Diamond was fully able to perform the essential functions of a dietitian at the Los Angeles VA Medical Center, the job she held before Ms. Karp and Ms. Verone became her supervisors, with the accommodation of 100% remote work. Indeed, Ms. Diamond worked 100% remotely without issue for approximately two years, during which numerous supervisors praised her work performance, before a new supervisor revoked the arrangement.

112.   At all relevant times, Defendant had actual knowledge of Ms. Diamond's disabilities and functional limitations.

113.   Defendant's agents, as described in this Complaint, willfully, knowingly and repeatedly failed to accord her the only accommodation reasonably adequate to protect her life and health while continuing her employment, namely a 100% work-from-home accommodation.

29

114.    Defendant's insistence on reassigning Ms. Diamond involuntarily to the MOVE program, an undesirable placement as described herein, was intended to force her to resign or give up her request for accommodation. As such it was a particularly egregious failure to accommodate, in that it punished her for her accommodation request and by extension her disabilities themselves.

115.    Defendant's purported equation of non-disabled persons with disabled persons for supposed "fairness" in granting work-from-home "privileges" willfully ignored Ms. Diamond's disabilities and her imperative medical need for a work-from-home accommodation that persons without disabilities did not require, and instead falsely equated persons with and without disabilities, thus violating the Rehabilitation Act and defying its commands.

116.    Defendant's assertions that essential functions of Ms. Diamond's job required in-person work were false as stated and were a pretext for failure to accommodate as required by the Rehabilitation Act.

117.    Ms. Diamond has exhausted her administrative remedies prerequisite to bringing this suit by timely seeking EEO counseling and filing her administrative complaint, and by filing the present Complaint within 90 days of receiving the final agency decision on her EEO complaint.

118.    As a result of Defendant's disparate and discriminatory treatment, Ms. Diamond has suffered and continues to suffer substantial economic and non-economic harms, including but not limited to the loss of wages and benefits from being forced into LWOP status, the loss of medical and annual leave time that

would otherwise have remained available to her, and emotional and psychic harms including soul-crushing disappointment, humiliation, loss of professional identity and self-respect, sense of betrayal, anger, anxiety, depression, insomnia, appetite disturbances, harm to personal relationships, loss of quality of life, and exacerbation of her underlying disabilities, as well as other damages warranting compensation in an amount to be determined at trial.

## COUNT III
### Hostile Work Environment / Harassment Based on Disability in Violation of the Rehabilitation Act of 1973, 29 U.S.C. § 791

119.   Ms. Diamond hereby incorporates each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

120.   At all relevant times, Ms. Diamond was a qualified individual with a disability within the meaning of the Rehabilitation Act, suffering from mediastinal B-cell lymphoma and SVC syndrome, conditions that substantially impair her immune and circulatory functions and substantially limit major life activities, including but not limited to performing manual tasks or any physical exertion, walking, standing, lifting, bending, breathing, and working.

121.   In addition, Ms. Diamond at all relevant times has suffered from the independently qualifying disability of allergy to the COVID-19 vaccine, which means she cannot be immunized against COVID. This condition substantially impairs the functioning of her immune system and makes her highly susceptible to a severe case of COVID-19, which in her case would be exceptionally life-threatening because of its blood-clotting sequela, a known complication more likely

31

lethal to SVC syndrome sufferers than to almost anyone in the general population. That severe danger makes it imperative that she avoid COVID exposure, and this life-or-death imperative—independently of her disabling cancer and SVC syndrome described herein—substantially impairs her respiratory function and limits her major life activities, including but not limited to breathing and breathing-related activities, caring for herself, being present in public spaces, obtaining necessities, obtaining medical and dental care, attending gatherings, maintaining normal family relations, and interacting in person with others, particularly in close proximity or in closed or poorly ventilated spaces, and overall requires near-total physical isolation, making her virtually a shut-in in her home.

122. Despite her disabilities as described in this Complaint and in the preceding Count, Ms. Diamond was fully able to performing the essential functions of a dietitian at the Los Angeles VA Medical Center, the job she held before Ms. Karp and Ms. Verone became her supervisors, with the accommodation of 100% remote work. Indeed, Ms. Diamond worked 100% remotely without issue for approximately two years, during which numerous supervisors praised her work performance, before a new supervisor revoked the arrangement.

123. At all relevant times, Defendant had actual knowledge of Ms. Diamond's disabilities and functional limitations.

124. In an effort to force Ms. Diamond to give up her requests for accommodation or resign her employment, Defendant's agents willfully and

knowingly harassed her by repeatedly denying that she had an impairment sufficient to make a 100% remote work accommodation necessary.

125.    Defendant's agents repeatedly sought to disrupt, stall, hinder and impede Ms. Diamond's requests for accommodation, and instead chose a course of severe and pervasive mistreatment designed to humiliate her and derail her career even though they knew she could perform, and had performed, her dietitian role fully and excellently before cancer struck her.

126.    The severe and pervasive mistreatment alleged in this Complaint and in this Court included:

      a.  Isolating Ms. Diamond by transferring her involuntarily to the MOVE program, a position for which she was not needed and received no meaningful work assignments;

      b.  Repeatedly denying reasonable accommodation requests despite successful remote work performance;

      c.  Forcing Ms. Diamond to exhaust all leave and placing her on LWOP status when she could not return to work in person;

      d.  Pressuring Ms. Diamond to report in person to obtain equipment despite knowing her medical condition prevented such appearances;

      e.  Initiating a retaliatory *Weingarten* investigation against Ms. Diamond for failing to comply with medically impossible directives;

      f.  Implementing discriminatory policies targeting employees with disabilities who seek accommodations.

127.    This conduct was severe and pervasive; it occurred because of Ms. Diamond's disability status; and it created an intimidating, hostile, and offensive work environment that unreasonably interfered with Ms. Diamond's work performance.

128.    By choosing and following this course of continuing severe and pervasive mistreatment, Defendant's agents deliberately created a hostile work environment for Ms. Diamond.

129.    Defendant is liable for creating this hostile work environment because its agents engaged, within the scope of their employment, in the intimidating, hostile and offensive conduct alleged herein.

130.    Ms. Diamond has exhausted her administrative remedies prerequisite to bringing this suit by timely seeking EEO counseling and filing her administrative complaint, and by filing the present Complaint within 90 days of receiving the final agency decision on her EEO complaint.

131.    As a result of Defendant's disparate and discriminatory treatment, Ms. Diamond has suffered and continues to suffer substantial economic and non-economic harms, including but not limited to the loss of wages and benefits from being forced into LWOP status, the loss of medical and annual leave time that would otherwise have remained available to her, and emotional and psychic harms including soul-crushing disappointment, humiliation, loss of professional identity and self-respect, sense of betrayal, anger, anxiety, depression, insomnia, appetite disturbances, harm to personal relationships, loss of quality of life, and

exacerbation of her underlying disabilities, as well as other damages warranting

compensation in an amount to be determined at trial.

## COUNT IV
### Retaliation Based on Protected Activity
### in Violation of the Rehabilitation Act of 1973,
### 29 U.S.C. § 791

132.    Ms. Diamond hereby incorporates each and every allegation set forth

in the preceding paragraphs as though fully set forth herein.

133.    At all relevant times, Ms. Diamond was a qualified individual with a

disability within the meaning of the Rehabilitation Act, suffering from mediastinal

B-cell lymphoma and SVC syndrome, conditions that substantially impair her

immune and circulatory functions and substantially limit major life activities,

including but not limited to performing manual tasks or any physical exertion,

walking, standing, lifting, bending, breathing, and working.

134.    In addition, Ms. Diamond at all relevant times has suffered from the

independently qualifying disability of allergy to the COVID-19 vaccine, which

means she cannot be immunized against COVID-19. This condition substantially

impairs the functioning of her immune system and makes her highly susceptible to

a severe case of COVID-19, which in her case would be exceptionally life-

threatening because of its blood-clotting sequela, a known complication more likely

lethal to SVC syndrome sufferers than to almost anyone in the general population.

That severe danger makes it imperative that she avoid COVID-19 exposure, and

this life-or-death imperative—independently of her disabling cancer and SVC

syndrome described herein—substantially impairs her respiratory function and

limits her major life activities, including but not limited to breathing and breathing-related activities, caring for herself, being present in public spaces, obtaining necessities, obtaining medical and dental care, attending gatherings, maintaining normal family relations, and interacting in person with others, particularly in close proximity or in closed or poorly ventilated spaces, and overall requires near-total physical isolation, making her virtually a shut-in in her home.

135.    Despite her disabilities as described in this Complaint, Ms. Diamond was fully able to perform the essential functions of a dietitian at the Los Angeles VA Medical Center, the job she held before Ms. Karp and Ms. Verone became her supervisors, with the accommodation of 100% remote work. Indeed, Ms. Diamond worked 100% remotely without issue for approximately two years, during which numerous supervisors praised her work performance, before a new supervisor revoked the arrangement.

136.    At all relevant times, Defendant had actual knowledge of Ms. Diamond's disabilities and functional limitations.

137.    Ms. Diamond engaged in protected activity by requesting reasonable accommodations several times, opposing Defendant's discriminatory practices regarding such accommodations, repeatedly objecting to her superiors that they were denying her those accommodations in violation of the Rehabilitation Act, repeatedly importuning her local HR personnel to require her supervisors to engage meaningfully, as they were not doing, in the interactive process required by the

statute, and filing an EEO complaint challenging Defendant's discriminatory conduct.

138.  At all relevant times, Defendant was aware of Ms. Diamond's protected activities as described herein.

139.  Following Ms. Diamond's engagement in protected activities, Defendant subjected her to adverse employment actions, including:

    g.  Denying reasonable accommodation requests;

    h.  Forcing her into LWOP status;

    i.  Involuntarily reassigning her to a highly undesirable position;

    j.  Pressuring her to violate her medical restrictions;

    k.  Initiating two separate *Weingarten* disciplinary investigations against her; and

    l.  Creating and subjecting her to a hostile work environment.

140.  A causal connection exists between Ms. Diamond's engagement in protected activities and Defendant's adverse employment actions.

141.  Defendant's actions constitute unlawful retaliation in violation of the Rehabilitation Act.

142.  Ms. Diamond has exhausted her administrative remedies prerequisite to bringing this suit by timely seeking EEO counseling and filing her administrative complaint, and by filing the present Complaint within 90 days of receiving the final agency decision on her EEO complaint.

143.   As a result of Defendant's disparate and discriminatory treatment, Ms. Diamond has suffered and continues to suffer substantial economic and non-economic harms, including but not limited to the loss of wages and benefits from being forced into LWOP status, the loss of medical and annual leave time that would otherwise have remained available to her, and emotional and psychic harms including soul-crushing disappointment, humiliation, loss of professional identity and self-respect, sense of betrayal, anger, anxiety, depression, insomnia, appetite disturbances, harm to personal relationships, loss of quality of life, and exacerbation of her underlying disabilities, as well as other damages warranting compensation in an amount to be determined at trial.

### *Prayer for Relief*

144.   Based on the foregoing claims, Ms. Diamond respectfully requests that the Court enter judgment in her favor and award her the following relief:

a. A declaration that Defendant's treatment of her as described herein was unlawful under the Rehabilitation Act.

b. Reinstatement to the same clinical dietitian position, with the same status, duties, and working conditions, that she held and enjoyed prior to her reassignment to the MOVE program;

c. Approval of her reasonable accommodation to work 100% remotely in that position, without durational limit, including all accommodations necessary to spare her from ever having to appear in person in the workplace for any reason;

d.  An injunction barring Defendant or his agents from ever rescinding or restricting that accommodation, requiring periodic reporting of continuing need therefor, or otherwise interposing any obstacle or impediment to her use of that accommodation;

e.  Restoration of all sick and annual leave she incurred from March 9, 2023, onward;

f.  Relief from her leave without pay status, and payment of full wages and benefits for all hours characterized as leave without pay from March 9, 2023, onward;

g.  Formal resolution of the two *Weingarten* investigations as unfounded with no disciplinary action taken, and any such investigation or other adverse action or disability-related disciplinary measures or notations removed from her record;

h.  Full repayment of all lost or unpaid wages and benefits;

i.  Pre-judgment interest;

j.  Compensatory (non-economic) damages;

k.  Costs and reasonable attorneys' fees; and

l.  Any other relief this Court deems just and proper.

### ***Demand for Jury Trial***

Plaintiff demands a trial by jury on any and all issues so triable.

Respectfully submitted,

_____

Stephen B. Pershing
D.C. Bar No. 482580
Samantha Sloane
D.C. Bar No. 90004037
Kalijarvi, Chuzi, Newman & Fitch, P.C.
818 Connecticut Avenue, N.W., Suite 1000
Washington, D.C. 20006
(202) 331-9260
spershing@kcnlaw.com
ssloane@kcnlaw.com

*Counsel for Plaintiff*

40